IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Catherine Patricia Oglesby, | ) | C/A No.: 1:15-2071-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

A.    Procedural History

On August 10, 2012, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on March 15, 2012. Tr. at 83, 85, 178–86, 188–94. Her applications were denied initially and upon reconsideration. Tr. at 123–27, 130–31,

132–33. On November 14, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Marcus Christ. Tr. at 32–55 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 10, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 10–31. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on May 19, 2015. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 47 years old at the time of the hearing. Tr. at 83. She completed high school and two semesters of college. Tr. at 51. Her past relevant work ("PRW") was as a sales associate and a housekeeping supervisor. Tr. at 52. She alleges she has been unable to work since March 15, 2012. Tr. at 83.

2.      Medical History

a.      Prior to Alleged Onset Date

Plaintiff was hospitalized at the Medical University of South Carolina's ("MUSC's") Institute of Psychiatry from November 30, 2009, to December 10, 2009, for suicidal ideation with a plan to overdose on Xanax. Tr. at 351. She indicated her fiancée had recently died. *Id.* She endorsed symptoms of major depressive disorder ("MDD") that included decreased energy, tearfulness, hopelessness, and sadness. *Id.* Plaintiff's physicians placed her on an alcohol detoxification protocol and prescribed Celexa for

2

MDD. Tr. at 352. They subsequently diagnosed post-traumatic stress disorder ("PTSD") and prescribed Seroquel. *Id.* Plaintiff responded poorly to Seroquel and Zyprexa. *Id.* Plaintiff's physicians discontinued both medications and prescribed Remeron for PTSD and Trazodone for sleep. Tr. at 352–53. Plaintiff's mood improved and her suicidal ideations resolved. Tr. at 353. By the time Plaintiff was discharged, she was regularly interacting with peers and participating in group therapy. *Id.*

Plaintiff presented to Neven Hadzijahic, M.D. ("Dr. Hadzijahic"), at Charleston Gastroenterology Specialists on November 22, 2010, for evaluation of retroperitoneal fluid collection and chronic abdominal pain. Tr. at 504. Dr. Hadzijahic indicated Plaintiff had developed abdominal pain over the prior six-month period. *Id.* He scheduled Plaintiff for an endoscopic ultrasound with fine-needle aspiration. *Id.* On December 14, 2010, the endoscopic ultrasound revealed a large perigastric cyst. Tr. at 537.

Plaintiff presented to David Lucas, M.D. ("Dr. Lucas"), at Surgical Associates of Charleston, P.A., on January 12, 2011, with a complaint of right upper abdominal pain. Tr. at 394. Dr. Lucas diagnosed a perigastric cystic lesion and a possible enteric duplication cyst. Tr. at 396. He performed laparoscopic excision of a falciform ligament lipoma on January 20, 2011. Tr. at 431–32.

On August 25, 2011, Dr. Lucas performed a laparoscopic resection of a lipoma on the right side of Plaintiff's liver. Tr. at 370–71.

Plaintiff presented to the emergency room ("ER") at Roper Hospital on October 1, 2011, with abdominal pain. Tr. at 397. The physician described Plaintiff as being in "obvious discomfort" and having a protuberant abdomen with marked warmth and

swelling, as well as tenderness at the site of her umbilical incision. *Id.* Plaintiff was diagnosed with a ventral incisional hernia. Tr. at 392. Dr. Lucas performed laparoscopic ventral incisional herniorrhaphy on December 1, 2011. Tr. at 435–36.

Plaintiff presented to the ER at St. Francis Hospital on December 21, 2011, with abdominal pain and near-syncope. Tr. at 660, 668. Matthew Kornegay, M.D., diagnosed probable infectious colitis and prescribed Cipro and Flagyl. Tr. at 676.

Plaintiff again presented to Dr. Hadzijahic on January 4, 2012, with a complaint of abdominal pain. Tr. at 503. Dr. Hadzijahic noted that a recent CT scan showed evidence of enterocolitis. *Id.* Plaintiff reported continued abdominal pain and diarrhea, despite taking a 10-day course of Cipro and Flagyl. *Id.* Dr. Hadzijahic prescribed a two-week course of Flagyl and referred Plaintiff for a colonoscopy. *Id.* On January 30, 2012, Plaintiff indicated that Flagyl had not helped and that she continued to experience intermittent diarrhea. Tr. at 504. Dr. Hadzijahic indicated a colonoscopy showed diverticulosis, but that random colon biopsies showed no evidence of microscopic colitis. *Id.* Plaintiff followed up on February 27, 2012, and complained of severe reflux symptoms with heartburn and regurgitation. Tr. at 501. She indicated her diarrhea had resolved. *Id.* Dr. Hadzijahic changed Plaintiff's medication for gastroesophageal reflux disease ("GERD") from Omeprazole to Dexilant and prescribed daily doses of Benefiber and probiotics. *Id.* He recommended Plaintiff be scheduled for an esophagogastroduodenoscopy ("EGD") to determine if she had esophagitis, peptic ulcer disease, or Barrett's esophagus. *Id.* He indicated a mild elevation in Plaintiff's liver

enzymes was likely the result of nonalcoholic fatty liver disease and recommended her liver enzymes be monitored every six months. *Id.*

Plaintiff presented to Carlotta Lalich, M.D. ("Dr. Lalich"), at MUSC's Institute of Psychiatry on February 6, 2012. Tr. at 634. Dr. Lalich indicated Plaintiff was being treated for MDD, PTSD, and anxiety, not otherwise specified ("NOS"). Plaintiff denied symptoms of depression and PTSD, but indicated her anxiety symptoms had been exacerbated by multiple psychosocial stressors. *Id.* Dr. Lalich continued Plaintiff's medications and instructed her to follow up in four weeks. Tr. at 635.

> b.    After Alleged Onset Date

On March 15, 2012, Plaintiff presented to the ER at Roper Hospital with abdominal pain. Tr. at 406. Her abdomen was tender and distended and she reported a four-day history of diarrhea and intractable vomiting. Tr. at 407–08. An x-ray indicated no frank bowel obstruction. Tr. at 408. Plaintiff's diagnoses included abdominal pain, dehydration, and acute diarrhea. Tr. at 409. She was discharged with prescriptions for Flagyl and pain medication. *Id.*

On March 30, 2012, an EGD showed Plaintiff to have a hiatal hernia in her stomach, but indicated she had a normal esophagus and duodenum. Tr. at 531. Duodenum and gastric biopsies indicated benign findings, aside from mild inactive gastritis. Tr. at 532.

Plaintiff followed up with Dr. Lalich on April 2, 2012. Tr. at 626. She reported that she had not been doing well since her last visit. *Id.* She endorsed depressive symptoms that included increased sleep, increased appetite, decreased energy, lack of

motivation, and apathy. *Id.* She indicated her anxiety had been manageable and denied having panic attacks. *Id.* She endorsed intermittent nightmares and flashbacks. *Id.* Dr. Lalich prescribed Wellbutrin. *Id.*

Plaintiff presented to Dr. Hadzijahic with severe substernal burning, regurgitation, and eructation on April 16, 2012. Tr. at 500. She indicated her symptoms worsened after surgery. *Id.* Dr. Hadzijahic indicated Plaintiff had GERD with a hiatal hernia that was not controlled with her current medication regimen, possibly due to underlying gastroparesis. *Id.* He also noted that Plaintiff had irritable bowel syndrome ("IBS") with improved small intestinal bacterial overgrowth. *Id.*

On April 18, 2012, Dr. Lucas indicated Plaintiff was completing treatment for Clostridium difficile colitis. Tr. at 580. Plaintiff denied difficulty swallowing, nausea, and appetite disturbance. *Id.* She discussed with Dr. Lucas the hiatal hernia, but Dr. Lucas indicated he was not convinced that it was causing her symptoms. *Id.* He suggested Plaintiff take more time to recover and follow up in three months regarding the hiatal hernia. *Id.*

Plaintiff followed up with Dr. Lalich on April 30, 2012. Tr. at 622. She reported doing well, despite her recent medical problems and loss of employment. *Id.* She indicated she was less withdrawn, was getting out more with the addition of Wellbutrin, and had fewer symptoms of depression and anxiety. *Id.* She complained of feeling tired the next day after taking Vistaril at night. *Id.* A mental status examination was normal. *Id.* Dr. Lalich continued Plaintiff's medications, but switched Wellbutrin to the XL formulation at 150 milligrams daily. Tr. at 623.

On May 11, 2012, Plaintiff presented to the ER at Roper Hospital with shortness of breath and chest pain. Tr. at 418. She was diagnosed with bacterial pneumonia. Tr. at 420. The next day, she presented to the ER at MUSC with chest pain and shortness of breath. Tr. at 355. She indicated she smoked cigarettes, but was trying to quit. *Id.* The provider noted that Plaintiff had some wheezing, but that it improved with use of a nebulizer. Tr. at 356. The provider diagnosed COPD exacerbation and bronchitis. *Id.* Plaintiff returned to the ER at Roper Hospital on May 14, 2012, with shortness of breath. Tr. at 424. She was diagnosed with chest wall pain and acute bronchitis. Tr. at 426.

Plaintiff presented to Katherine A. Tabor, NP ("Ms. Tabor"), on May 16, 2012, with severe rib pain. Tr. at 567. Ms. Tabor prescribed Valium for pain, referred Plaintiff for a chest x-ray, and instructed her to follow up in two days. Tr. at 568. Edward Newton, IV, M.D. ("Dr. Newton"), indicated Plaintiff was doing much better on May 18, 2012. Tr. at 564. However, he noted that x-rays showed fractures of the sixth and seventh ribs on the left and a 1.6 centimeter nodule that was likely pleural edema. *Id.*

Plaintiff complained to Dr. Hadzijahic of severe constipation, increased abdominal bloating, and abdominal wall pain on May 21, 2012. Tr. at 499. Dr. Hadzijahic indicated Plaintiff's constipation was caused by her medications. *Id.* He instructed Plaintiff to start Miralax daily, to take probiotics daily, to use Milk of Magnesia as needed, and to follow a low fat, low residue diet. *Id.*

Plaintiff reported feeling much better on June 18, 2012. Tr. at 553. She indicated to Dr. Newton that her chest pain had improved; that Wellbutrin and Celexa were

working well to control symptoms of depression and PTSD; and that she was not often taking Vistaril for anxiety. *Id.*

On June 20, 2012, Plaintiff complained to Dr. Hadzijahic of severe constipation that alternated with severe abdominal cramps and diarrhea. Tr. at 498. Dr. Hadzijahic encouraged Plaintiff to take Miralax and probiotics daily and prescribed Xifaxan to treat a bacterial overgrowth in her small intestine. *Id.*

Plaintiff presented to Dr. Lalich on June 27, 2012. Tr. at 619. She indicated she was experiencing stress because she recently lost her job. *Id.* She stated she would like to perform part-time work, but would have difficulty getting to work because she shared a car with her husband. *Id.* She indicated she was managing her psychiatric symptoms and denied recent panic attacks. *Id.* She stated her mood had improved since she started Wellbutrin. *Id.* She endorsed some exacerbated symptoms of PTSD, including intrusive thoughts and a few nightmares. *Id.* Dr. Lalich noted no abnormalities on mental status examination. Tr. at 620.

On July 17, 2012, Plaintiff presented to nephrologist N. Brent Hamilton, M.D. ("Dr. Hamilton"). Tr. at 481–82. Dr. Hamilton noted that Plaintiff had chronic microscopic hematuria, non-insulin-dependent diabetes, obstructive sleep apnea, and only one kidney. Tr. at 481. He noted no abnormalities on examination and advised Plaintiff to be aggressive with diabetic and sleep apnea control to prevent progression of kidney disease. Tr. at 482.

On July 27, 2012, Plaintiff indicated to Dr. Hadzijahic that her bloating and diarrhea had significantly improved, but that she continued to experience intermittent

bloating and a sense of incomplete bowel evacuation. Tr. at 497. She denied rectal bleeding, focal abdominal pain, nausea, and vomiting. *Id.* Dr. Hadzijahic indicated Plaintiff's IBS with small intestinal bacterial overgrowth had improved. *Id.*

Plaintiff presented to Dr. Newton on July 27, 2012, and indicated she felt like she cracked her ribs as the result of coughing. Tr. at 546. Dr. Newton indicated Plaintiff exacerbated her previous rib fracture. Tr. at 547. He prescribed a Lidoderm patch. *Id.*

Plaintiff presented to the ER at Roper Hospital on August 7, 2012, with shortness of breath and pain in her left ribs and upper back. Tr. at 642. The physicians diagnosed chest wall pain. Tr. at 644. A bone density scan showed Plaintiff to have osteopenia. Tr. at 641.

On August 8, 2012, Plaintiff presented to Crystal Gutierrez, PA-C ("Ms. Gutierrez"), at Pain Specialists of Charleston, P.A. Tr. at 710. She endorsed left chest wall pain that she described as an eight on a 10-point scale. *Id.* She complained of pain on flexion and extension of her spine. Tr. at 711. Ms. Gutierrez noted paraspinous tenderness on the left at T10 to T12 and tenderness over Plaintiff's left lateral chest wall. *Id.* She diagnosed mononeuritis, prescribed Gabapentin, and recommended a left intercostal nerve block. *Id.*

On August 13, 2012, Plaintiff indicated to Dr. Newton that she continued to experience pain related to her rib fracture that she rated as a six out of 10. Tr. at 542. She stated she was experiencing some confusion since she started taking Gabapentin, but she admitted she increased her dose faster than usual. *Id.* She indicated she was not sleeping well with her CPAP mask, and Dr. Newton indicated he would prescribe Vistaril and

schedule her for another mask fitting. *Id.* Plaintiff denied gastrointestinal symptoms. Tr. at 543. Dr. Newton instructed Plaintiff to continue her same medications for diabetes, rib fracture, hyperlipidemia, depression and GERD and to take an over-the-counter medication for osteopenia. Tr. at 544–45.

Plaintiff followed up with Dr. Lucas on August 13, 2012. Tr. at 582. She reported some pain and acid reflux, but indicated her symptoms had improved since she was treated for bacterial overgrowth. *Id.* Dr. Lucas encouraged Plaintiff to continue to lose weight, to maintain a fiber regimen, and to follow up in six months. *Id.*

Plaintiff presented to Adrienne Langlinais, M.D. ("Dr. Langlinais"), on August 17, 2012, for treatment of MDD, PTSD, and anxiety disorder, NOS. Tr. at 614. She indicated her recent health problems had increased her depressive symptoms. *Id.* Dr. Langlinais observed Plaintiff to have normal mental status. *Id.* She noted Plaintiff was coping well, despite having multiple psychosocial stressors. Tr. at 615.

Plaintiff presented to Edward Tavel, M.D. ("Dr. Tavel"), at Pain Specialists of Charleston, P.A., on August 27, 2012, for a left intercostal injection for chest wall pain. Tr. at 713. Plaintiff indicated Gabapentin provided some pain relief, but she continued to rate her pain as an eight out of 10. *Id.* Dr. Tavel discontinued Gabapentin and prescribed Gralise. *Id.*

Plaintiff followed up with Dr. Newton on September 10, 2012. Tr. at 721. She complained of sinus pressure, but denied myalgias and abdominal pain. *Id.* Dr. Newton indicated Plaintiff was not compliant with use of CPAP. *Id.* He recommended Plaintiff lose weight and prescribed Nuvigil. *Id.*

On September 14, 2012, Plaintiff followed up with Dr. Tavel for a second intercostal injection. Tr. at 729. She reported 40 percent pain relief from the first injection. *Id.* She indicated she decreased her dosage of Gralise because of side effects. *Id.*

Plaintiff complained to Dr. Hadzijahic of worsened constipation on September 14, 2012. Tr. at 782. Dr. Hadzijahic instructed Plaintiff to take Miralax daily and Milk of Magnesia as needed for constipation. *Id.*

State agency medical consultant Isabella McCall, M.D., completed a physical residual functional capacity ("RFC") assessment on September 20, 2012. Tr. at 65–67. She indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour day; sit for a total of about six hours in an eight-hour day; frequently push, pull, and reach with the left upper extremity; frequently climb ramps and stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and must avoid even moderate exposure to hazards. *Id.*

On September 24, 2012, Plaintiff presented to Bonnie Cleaveland, Ph. D. ("Dr. Cleaveland"), for a mental status examination. Tr. at 735–38. Dr. Cleaveland administered the Neurobehavioral Cognitive Status Exam, which showed Plaintiff to have mental status within normal limits. Tr. at 737. Dr. Cleaveland concluded that Plaintiff was able to manage funds if they were awarded and could concentrate and

persist on simple tasks. Tr. at 738. Her diagnostic impressions included PTSD, MDD, and alcohol dependence, in remission. *Id.*

On October 2, 2012, Dr. Newton indicated Plaintiff's mental diagnoses included depression and PTSD. Tr. at 720. He stated Plaintiff's medications included Wellbutrin, Celexa, and Vistaril, which were prescribed by her physician at MUSC. *Id.* He indicated Plaintiff's medications had helped her condition. *Id.* He described Plaintiff as being oriented to all spheres; having intact thought processes; demonstrating appropriate thought content; having normal mood and affect; showing good attention and concentration, and demonstrating good memory. *Id.* He indicated Plaintiff exhibited no work-related limitations of function due to a mental condition, but suggested Plaintiff's psychiatrist would be able to better assess her limitations. *Id.*

On October 8, 2012, state agency consultant Michael Neboschick, Ph.D., reviewed the record and completed a psychiatric review technique form ("PRTF"). Tr. at 62–64. He considered Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, and 12.09 for substance addiction disorders. Tr. at 63. He assessed Plaintiff to have mild restriction of activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. *Id.* State agency consultant Olin Hamrick, Jr., Ph. D., considered the same Listings and assessed the same level of restriction on December 18, 2012. Tr. at 95–96.

Plaintiff presented to Dr. Newton on October 22, 2012, with complaints of diarrhea and right upper quadrant pain. Tr. at 765. She also complained of lung pain, chills, diaphoresis, nausea, myalgia, otalgia, headache, nonproductive cough, shortness of

12

breath and wheezing. *Id.* Plaintiff complained of side effects from Gralise, and Dr. Newton instructed her to reduce her dosage. *Id.* Dr. Newton referred Plaintiff for an abdominal ultrasound and lab work, which showed no abnormalities. Tr. at 768. He subsequently referred her for an abdominal computed tomography ("CT") scan. *Id.* The CT scan indicated no abnormalities. Tr. at 783.

Plaintiff presented to Marc Noble, M.D. ("Dr. Noble"), at Charleston Gastroenterology Specialists on October 25, 2012. Tr. at 780–81. She complained of a two-week history of abdominal pain with more recent onset of diarrhea and nausea. Tr. at 780. Dr. Noble noted Plaintiff's pain increased when he asked her to perform a crunch and he observed her to be extremely tender to palpation. *Id.* Dr. Noble suspected Plaintiff was dealing with abdominal wall pain that was possibly related to the mesh or to a simple strain. *Id.* He prescribed Zofran for nausea and Lortab for pain. *Id.*

On November 5, 2012, Plaintiff indicated to Dr. Newton that she was experiencing nausea and abdominal pain. Tr. at 761. Dr. Newton observed Plaintiff to be tender to palpation in the periumbilical and right upper quadrant areas of her abdomen. Tr. at 763. Dr. Newton continued Plaintiff's prescriptions and indicated she should continue to follow up with the gastroenterologist for her abdominal symptoms. Tr. at 764.

Plaintiff followed up with Dr. Hadzijahic on November 19, 2012. Tr. at 779. He indicated Plaintiff's abdomen was soft and nondistended. *Id.* He noted Plaintiff had diffuse abdominal wall tenderness without palpable mass, rebound, or guarding. *Id.* He suggested Plaintiff may have fibromyalgia and referred her for a rheumatology evaluation. *Id.*

13

On December 27, 2012, Plaintiff presented to rheumatologist Sofia Aksentijevich, M.D. ("Dr. Aksentijevich"). Tr. at 788. Dr. Aksentijevich indicated Plaintiff's abdomen was soft, but diffusely tender. *Id.* She described Plaintiff as having a normal gait and stance. *Id.* She observed Plaintiff to have normal range of motion ("ROM") of her spine and all joints and to have no swelling. *Id.* She noted Plaintiff had marked tender points of fibromyalgia and displayed hyperesthesia diffusely all over her back. *Id.* Plaintiff had normal muscle strength, pulses, and deep tendon reflexes. *Id.* Dr. Aksentijevich diagnosed fibromyalgia and recommended Plaintiff discontinue Celexa, start Cymbalta, and engage in low-impact aerobic exercise with gentle stretching at least four times per week. Tr. at 789.

State agency medical consultant George T. Keller, M.D., reviewed the record and completed a physical RFC assessment on January 17, 2013. Tr. at 97–100. He indicated Plaintiff was limited as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for a total of about four hours in an eight-hour day; sit for a total of about six hours in an eight-hour day; frequently push, pull, and lift with the left upper extremity; frequently balance; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and avoid even moderate exposure to hazards. *Id.*

Plaintiff followed up with Dr. Newton on January 31, 2013, and reported that she did not react well to Cymbalta. Tr. at 822. She requested pain medication, but Dr. Newton indicated he was unwilling to prescribe long-term pain medications. *Id.* Dr.

Newton recommended Plaintiff follow up with Dr. Tavel. *Id.* He indicated Plaintiff did not use her CPAP machine and had returned it. *Id.* He recommended Plaintiff follow a diet and exercise for weight loss. Tr. at 824–25.

On February 28, 2013, Plaintiff complained to Dr. Newton of a rash that had appeared intermittently since her surgery. Tr. at 827. Dr. Newton indicated it was likely chronic urticaria. *Id.* He stated Plaintiff's abdominal pain was likely related to her fibromyalgia. Tr. at 829. He noted that Plaintiff applied for disability and stated it was his opinion "given her sig medical problems that pt is likely unable to work." Tr. at 829–30.

On March 21, 2013, Plaintiff complained to Dr. Hadzijahic of worsened reflux symptoms and pharyngeal dysphagia for both solids and liquids. Tr. at 799. Dr. Hadzijahic recommended Plaintiff change her antacid regimen by taking Dexilant in the morning and Zantac in the evening. *Id.* He indicated he would schedule Plaintiff for another EGD and consider a modified barium swallow and an evaluation with an ear, nose, and throat ("ENT") specialist. *Id.*

Plaintiff presented to Alan N. Brown, M.D. ("Dr. Brown"), at Low Country Rheumatology on March 28, 2013. Tr. at 801–04. Dr. Brown observed Plaintiff to have full ROM in all her joints and to have no active synovitis. Tr. at 804. He noted that Plaintiff had widespread soft tissue tender points. *Id.* Dr. Brown assessed fibromyalgia and indicated that management of the impairment was complicated by Plaintiff's comorbid psychiatric conditions. *Id.* He recommended Plaintiff engage in regular aerobic exercise, stop smoking, and obtain proper sleep. *Id.*

On April 4, 2013, Dr. Newton indicated that Plaintiff may benefit from surgery to address symptoms of obstructive sleep apnea. Tr. at 835. He referred Plaintiff to an ENT specialist. Tr. at 837–38.

On September 19, 2013, Dr. Newton indicated Plaintiff's insurance provider had denied coverage for Provigil and that Plaintiff was unable to afford tonsil surgery to treat obstructive sleep apnea. Tr. at 840. He noted Plaintiff experienced wheezing at times, but continued to smoke cigarettes. *Id.* Dr. Newton stated the following:

> In my opinion her main disability issue really is bad fibromyalgia with depression. I do not think that she will be able to return to the work force and think it is best that she be determined disabled so she can spend the time needed taking care of herself medically.

Tr. at 843. The same statement was repeated in a record from Lindsey Kettinger, NP, dated November 8, 2013. Tr. at 854.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on November 14, 2013, Plaintiff testified she had stopped working in March 2012. Tr. at 36. She indicated she had been sick for the past three years and had undergone four surgeries in 2011 to remove tumors. *Id.* She stated she still had two tumors in her neck. *Id.* She indicated that she had horrible stomach pain and fibromyalgia. *Id.* She stated that depression and PTSD were bothering her most in 2012. *Id.* She indicated her symptoms included flashbacks, visual hallucinations, nightmares, and anxiety attacks. Tr. at 36–37. She stated she had difficulty being around a lot of

people. Tr. at 37. Plaintiff also indicated she had COPD that she treated with Symbicort, Spiriva, and a nebulizer. Tr. at 38. She testified she continued to smoke cigarettes, but was trying to quit. *Id.* She indicated she experienced shortness of breath on a daily basis and had developed bronchitis and pneumonia in the past. Tr. at 39. She stated her breathing problems were exacerbated by humidity and exposure to dust and chemicals. Tr. at 40.

Plaintiff testified she experienced pain and burning sensations throughout her body, as a result of fibromyalgia. Tr. 48–49. She indicated she had been unable to take medication for fibromyalgia because the medications worsened her depression and PTSD. Tr. at 49. She stated she treated her fibromyalgia-related pain with warm baths and heating pads. Tr. at 50.

Plaintiff testified her fiancée died unexpectedly in October 2009. Tr. at 41–42. She indicated she was hospitalized for PTSD following his death. Tr. at 41. She subsequently married her current husband in October 2010. Tr. at 42.

Plaintiff testified that her medications caused side effects that included symptoms of IBS and increased anxiety. Tr. at 43. She stated her medications impaired her memory and concentration. Tr. at 45. She indicated she had tried to use a CPAP machine, but that it did not work. Tr. at 43. She stated her doctor had suggested she have her tonsils removed to improve symptoms of sleep apnea, but that she was unable to afford surgery. *Id.* She indicated she was unable to take her anxiety medication at night because of her sleep apnea and that she slept in a chair to decrease the likelihood that her airflow would be restricted. *Id.*

Plaintiff testified she spent the majority of each day reading and watching television while sitting in a recliner. Tr. at 46, 50. She indicated that she did some light cleaning, but was unable to dust or clean her bathrooms because of her breathing problems. Tr. at 46. She stated she did not drive or leave the house without her husband or a friend. Tr. at 46–47.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Tonetta Watson-Coleman reviewed the record and testified at the hearing. Tr. at 52–66. The VE categorized Plaintiff's PRW as a sales associate, *Dictionary of Occupational Titles* ("*DOT*") number 211.462-014, as light and semi-skilled with a specific vocational preparation ("SVP") of three and a housekeeping supervisor, *DOT* number 187.167-046, as light and highly skilled with an SVP of eight. Tr. at 52. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with frequent balancing and pushing and pulling with the left arm; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, stooping, crouching, kneeling and crawling; no concentrated exposure to irritants such as fumes, odors, dusts, and gases; not even moderate exposure to moving machinery and unprotected heights; and was limited to simple, routine, repetitive tasks in a low stress work environment (defined as having only occasional changes in the work setting) with only occasional interaction with the public. *Id.* The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified unskilled jobs with an SVP of two as a ticket seller,

DOT number 211.467-030, with 57,620 positions in South Carolina and 3,314,870 positions in the national economy; a housekeeper, DOT number 323.687-014, with 15,508 positions in South Carolina and 877,980 positions in the national economy; and a laundry worker, DOT number 302.685-010, with 15,580 position in South Carolina and 877,980 positions in the national economy.[1] Tr. at 53.

The ALJ next asked the VE to consider an individual of Plaintiff's vocational profile who could perform sedentary work with the following limitations: frequent balancing and pushing and pulling with the left arm; no climbing of ladders, ropes, or scaffolds; only occasional climbing of ramps and stairs, stooping, crouching, kneeling, and crawling; must avoid concentrated exposure to irritants such as fumes, odors, dusts, and gases; must avoid moderate exposure to moving machinery and unprotected heights; and limited to simple, routine, repetitive tasks in a low stress environment (defined as a having only occasional changes in the work setting) with only occasional interaction with the public. Tr. at 53–54. The VE indicated the hypothetical individual could perform sedentary jobs with an SVP of two as an addresser, DOT number 209.587-010, with 500 positions in South Carolina and 96,330 positions in the national economy; a surveillance system monitor, DOT number 379.367-010, with 550 positions in South Carolina and 74,470 positions in the national economy; and a telephone quotation clerk, DOT number 237.367-046, with 15,900 position in South Carolina and 973,800 positions in the national economy. Tr. at 54.

---

[1] The ALJ confirmed with the VE that the number of jobs for laundry workers and housekeepers were the same. See Tr. at 53.

The ALJ asked the VE to assume the individual would be off task for more than an hour per day, in addition to regularly-scheduled breaks, because of a combination of medical conditions and prescription medications. Tr. at 55. He asked if there would be jobs the individual could perform. *Id.* The VE indicated that limitation would eliminate all jobs. *Id.*

### 2.    The ALJ's Findings

In his decision dated January 10, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since March 15, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*)

3.    The claimant has the following severe impairments: depression, a post-traumatic stress disorder, chronic obstructive pulmonary disease and fibromyalgia (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work (described as requiring lifting and carrying up to 10 pounds occasionally and lesser amounts frequently, sitting for 6 hours in an 8-hour day, and standing and walking occasionally (2 hours in an 8-hour day)) with frequent pushing/pulling with the left arm, and no climbing of ladders, ropes or scaffolds and only occasional climbing of ramps and stairs. The claimant must avoid concentrated exposure to respiratory irritants such as dust, gases and fumes and more than moderate exposure to moving machinery and unprotected heights. The claimant is limited to simple, routine, repetitive tasks in a low stress environment (defined as involving only occasional change in work setting) with occasional interaction with the public.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on July 23, 1966 and was 45 years old, which is defined as a younger individual age 45–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from March 15, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 15–26.

## II.    Discussion

Plaintiff alleges the Commissioner erred in failing to consider the combined effect of her impairments. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.    Legal Framework

#### 1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

(providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Plaintiff argues the ALJ did not consider the combined effect of her impairments. [ECF No. 13 at 16]. She maintains that her multiple impairments negatively interact with one another to prevent her from completing job-related functions. *Id.* at 19. She contends that her medications and the side effects she experiences from them further reduce her abilities. *Id.* at 19–20.

The Commissioner argues the ALJ appropriately considered the combined effect of Plaintiff's impairments and assessed an RFC that included all of her credibly-established functional limitations. [ECF No. 14 at 10]. She maintains the ALJ considered Plaintiff's impairments individually at step two and considered the combined effect of her impairments at step three and in assessing her RFC. *Id.* at 12. She contends the ALJ explicitly stated that he considered the combined effect of Plaintiff's impairments, as required by *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). *Id.* Finally, she argues the ALJ explained his reasons for declining to find that Plaintiff's combination of impairments imposed more significant limitations than those indicated in the assessed RFC. *Id.* at 13.

When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and her disability status. *See Walker*, 889 F.2d at 50; *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner must consider the combined effect of all of the individual's impairments "without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(b)(2)(B) (2004). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the

impairments." *Id.* This court subsequently specified that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)).

The ALJ stated that he considered the "cumulative effects" of Plaintiff's severe and non-severe impairments on her ability to work and cited *Walker v. Bowen*. Tr. at 18. He stated the following:

> While the combination of the claimant's impairments imposes some limitations, there is no indication in the record that the claimant's ability to sustain consistent function has been complicated by the combination of these impairments. There is no evidence that the combination of the claimant's impairments imposes greater limitations than those established in the residual functional capacity stated below.

Tr. at 18. He later stated that he considered "the claimant's combination of physical impairments by finding her limited to the performance of sedentary work activity with no climbing of ladders, ropes or scaffolds and only occasional climbing of ramps and stairs with frequent pushing/pulling with the left arm[.]" Tr. at 22. He indicated Plaintiff "must avoid concentrated exposure to respiratory irritants such as dust, gases and fumes due to her COPD" and "more than moderate exposure to moving machinery and unprotected heights due to her subjective pain complaints and alleged medication side effects." *Id.* He stated he "took into account the claimant's depression, post-traumatic stress disorder, and her subjective pain complaints by concluding her limited to simple, routine, repetitive

26

tasks in a low stress environment (defined as involving only occasional change in work setting) with occasional interaction with the public." Tr. at 23. He then stated:

> In summary, the claimant's physical impairments could reasonably be expected to limit her performance to a range of sedentary work and her depression and subjective pain complaints could be anticipated to restrict her to simple, routine, repetitive tasks in a low stress environment (defined as involving only occasional change in work setting) with occasional interaction with the public. However, in light of the evidence suggesting the claimant may have been overstating her symptoms, I cannot find the claimant's allegation that she is incapable of all work activity to be credible.

*Id.*

As this court has recognized in other cases, the Fourth Circuit has declined to elaborate on what serves as an "adequate" explanation of the combined effect of a claimant's impairments. *See Cox v. Colvin*, No. 9:13-2666-RBH, 2015 WL 1519763, at *6 (D.S.C. Mar. 31, 2015); *Latten-Reinhardt v. Astrue*, No. 9:11-881-RBH, 2012 WL 4051852, at *4 (D.S.C. Sept. 13, 2012). Here, the ALJ indicated that he did not consider Plaintiff's impairments in a fragmented manner, but rather analyzed their cumulative effect. Tr. at 18, 22–23. The Fourth Circuit has suggested that the court should accept the ALJ's word, unless the evidence suggests otherwise. *See Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter."). Here, the ALJ explicitly stated that he considered the combined effect of Plaintiff's

impairments in accordance with the Fourth Circuit's ruling in *Walker*. Tr. at 18. He specified that the combined effect of Plaintiff's physical impairments was to limit her to sedentary work with no climbing of ladders, ropes or scaffolds; only occasional climbing of ramps and stairs; and frequent pushing/pulling with the left arm. *See* Tr. at 22. He then assessed additional physical limitations based on individual impairments, including limiting Plaintiff's exposure to environmental irritants based on her COPD and precluding her from more than moderate exposure to moving machinery and unprotected heights because of her subjective complaints of pain and side effects of her medications. *See id.* The ALJ considered Plaintiff's depression, PTSD, and subjective complaints of pain together in finding she was limited to simple, routine, repetitive tasks in a low stress environment, with only occasional interaction with the public. *See* Tr. at 23. Thus, the ALJ considered Plaintiff's physical impairments in combination in assessing some limitations, her mental limitations in combination in assessing other limitations, and individual impairments in assessing still other limitations. Finally, he explained that he considered all of Plaintiff's credibly-established symptoms in assessing her RFC, but could not find that she had additional limitations. *See* Tr. at 18, 23. A review of the decision as a whole yields no evidence to dispute the ALJ's contention that he considered the combined effect of Plaintiff's impairments.

Although Plaintiff alleges the ALJ did not consider the combined effect of several of her impairments, she is essentially asking this court to reweigh the ALJ's findings regarding the severity of her impairments and the limitations they imposed. While she argues the ALJ did not consider her fibromyalgia-related pain in combination with her

depression and PTSD, the undersigned notes that the ALJ specified that he considered these impairments and symptoms in combination. *See* Tr. at 23. He indicated that he did not assess more significant limitations as a result of Plaintiff's pain because she was routinely described as being in no apparent distress; denied having any significant myalgias during a visit with her primary care physician in November 2012; and was instructed by her rheumatologist to regularly exercise. Tr. at 20. As for Plaintiff's claim that the ALJ failed to consider that her sleep apnea and medications prevented her from maintaining a healthy sleep schedule and worsened her pain and mental state, the undersigned notes that the ALJ found that Plaintiff did not comply with prescribed therapy for sleep apnea; that obstructive sleep apnea was a non-severe impairment that did not impose "any significant work-related functional limitations" during the relevant period; and that she overstated her symptoms. Tr. at 16, 23. Although the ALJ did not find Plaintiff was completely unable to function as a result of her combination of impairments, he made specific provisions in the assessed RFC for her pain and the side effects of her medications. Tr. at 22–23. In determining the RFC, the ALJ noted and gave great weight to Dr. Cleaveland's opinion that Plaintiff was able to concentrate and persist on simple tasks. Tr. at 21. He cited the following evidence in support of the mental limitations in the RFC assessment: a March 2012 ER report that described Plaintiff as alert and well-oriented and that noted that she responded appropriately to questions and had intact recent memory; an August 2012 psychiatric progress note that described Plaintiff as having appropriate, goal-directed, and coherent thought content and fair-to-good insight and judgment; Dr. Cleaveland's observations that Plaintiff had normal

mental status, accurately repeated six digits in the same order given, performed a three-step command, repeated a complex phrase exactly, named part of a common object, remembered two of four words after a delay, performed simple multiplication, described an abstract relationship between two objects, and accurately responded to a simple question of judgment; and a September 2013 examination that showed Plaintiff to have normal mood, intact language and comprehension, and normal knowledge and judgment. Tr. at 23. In sum, while the ALJ could have concluded that Plaintiff's combination of impairments resulted in a complete inability to function vocationally, he weighed the conflicting evidence and cited sufficient records to support the limitations he found and his conclusion that Plaintiff retained functional abilities that allowed her to perform some work. Because he supported his conclusion with substantial evidence, it is not the role of the court to reweigh that evidence. *See Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). Therefore, the undersigned recommends the court find the ALJ's RFC assessment reflects adequate consideration of the combined effect of Plaintiff's impairments.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

April 7, 2016                                    Shiva V. Hodges
Columbia, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).